UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

QUINCY WILLIAMS,

      Petitioner,

v.                                                                      CASE NO. 6:04-cv-479-Orl-18DAB

SECRETARY, FLORIDA DEPARTMENT
OF CORRECTIONS, et al.,

      Respondents.

_____

## ORDER

Petitioner initiated this action for habeas corpus relief pursuant to 28 U.S.C. section 2254 (Doc. No. 13).  Upon consideration of the amended petition, the Court ordered Respondents to show cause why the relief sought in the petition should not be granted. (Doc. No. 33).  Thereafter, Respondents filed a response to the amended petition for writ of habeas corpus in compliance with this Court's instructions and with the *Rules Governing Section 2254 Cases in the United States District Courts* (Doc. No. 35).  Petitioner filed a reply to the response.  (Doc. No. 42).

Petitioner alleges eleven claims for relief in his habeas petition. Petitioner's first two claims allege that the trial court: (1) failed to conduct an examination of the voir dire panel regarding a comment made by a third party in the "venire persons' collective presence;" (claim one) and (2) denied Petitioner a new trial (claim two). (Doc. No. 13).  Petitioner's nine remaining claims allege that trial counsel provided ineffective assistance by: (1) failing

to question a potential juror regarding a comment made to another potential juror by a third party (claim eight); (2) failing to investigate the defense of consensual entry to the armed burglary charge (claim five); (3) conceding Petitioner's guilt (claim seven); (4) failing to call a toxicologist to testify regarding the effect of cocaine on the victim's mental state (claim ten); (5) failing to object to the admission of evidence regarding a prior crime contained in Petitioner's tape-recorded statement (claim six); (6) failing to file a motion *in limine* before trial regarding Petitioner's purported gang involvement with "the Willow Bend Boys" (claim nine); and (7) failing to object to multiple instances of prosecutorial misconduct during trial and during opening and closing arguments (claims three and four). *Id.* Petitioner's final claim is that he was provided ineffective assistance of counsel based upon counsel's cumulative errors (claim eleven). *Id.*

## FACTS AND PROCEDURAL HISTORY

On February 7, 1999, Joseph Jacobs (the "Victim") was shot and killed in a small home located at 4338 Arch Street in Orange County, Florida (the "House"). Erika Justice rented the House, and on the evening of February 7, 1999, the House was occupied by Ms. Justice; her cousins Lakeshia Johnson, Stacey Brooks, and Crystal Pugh; the children of Ms. Justice and Ms. Pugh; the Victim, and the victim's son, Terrelis Jacobs. (Appendix I at 244-47 & 294-95). Ms. Justice, Ms. Pugh, Ms. Johnson, Ms. Brooks, Mr. Jacobs, and Petitioner all testified at Petitioner's trial regarding the events surrounding the death of the Victim.

2

Ms. Pugh, Ms. Justice, Ms. Johnson, Ms. Brooks, and Mr. Jacobs all testified that on the day of the Victim's death, they witnessed an altercation at the House between Petitioner and the Victim regarding drugs. (Appendix I at 260-63, 297-99, 301-302, 322-24, 537-38 & 568-71). Petitioner was told to leave, and as he departed the House, he threatened that no one would sleep in the House that night. *Id.* at 262-63, 302, 325, 538 & 571.

Ms. Pugh, Ms. Justice, and Mr. Jacobs testified that they were in the living room when Petitioner returned later that evening, forced his way into the House with a handgun in his right hand, and shot the Victim, who had been in the kitchen. *Id.* at 265-69, 303, 326-27 & 339-41. According to Ms. Pugh, who was sitting on the sofa in the living room when the Petitioner entered the House, Petitioner was standing directly in front of her when he shot the victim. *Id.* at 265-69 & 303. Ms. Pugh, Ms. Justice, and Mr. Jacobs further testified that as Mr. Jacobs ran out the door after Petitioner shot the Victim, Mr. Jacobs bumped the Petitioner, and the gun fell to the floor. *Id.* at 270-71, 305-06 & 328. According to Ms. Pugh and Ms. Justice, Petitioner picked up the gun and left the House. *Id.* at 271-73 & 306.

Petitioner's version of the events on the evening of February 7, 1999, differs in several respects from the State's witnesses.[1] According to Petitioner, he went to the House only one time on February 7, 1999, when summoned by the Victim who escorted him inside. (Appendix I at 612-18). Once Petitioner was inside the House, the Victim began

---

[1]By way of background, Petitioner testified that he is a five-time convicted felon and drug dealer who carried a fully-loaded gun while selling drugs. (Appendix I at 609-12 & 633-36). Petitioner further testified that he sold crack cocaine to the Victim, as well as to Ms. Brooks, Ms. Pugh and Ms. Justice. *Id.*

complaining about the quality of crack cocaine Petitioner sold him the previous day. *Id.* at 619-23 & 628-29. According to Petitioner, the Victim then attempted to rob him, they "tussled," and Mr. Jacobs hit Petitioner in the back of the head with a bottle and both men pinned him against a wall. *Id.* at 623-24. During the tussle, Petitioner reached for the nine millimeter semiautomatic gun in his waistband, but Mr. Jacobs grabbed the gun, which dropped to the floor and discharged. *Id.* at 624-26 & 629. Petitioner testified that he then picked the gun up and ran from the House. *Id.* at 626. During cross-examination, Petitioner testified that he normally kept the safety locked on his gun and he did not know how it unlocked prior to the shooting. *Id.* at 639.

Petitioner testified that after the shooting, he threw the gun in a lake and attempted to get "out of town." (Appendix I at 630 & 643-44). During police questioning after his arrest, Petitioner denied having been at the House when the Victim was shot, provided a false alibi, and denied knowing what happened to the gun. *Id.* at 626-27 & 637-43.

On October 15, 1999, after a three-day trial, the jury found Petitioner guilty of first-degree murder and armed burglary with a firearm. (Appendices II and III). At Petitioner's sentencing on October 27, 1999, the trial court denied Petitioner's motion for a new trial. (Appendix VI at 4-7). The trial court then sentenced Petitioner to two concurrent terms of life imprisonment. *Id.* at 11-13. Petitioner appealed his convictions and sentences, and the Florida Fifth District Court of Appeals affirmed *per curiam* on September 12, 2000. *Williams v. State*, 768 So. 2d 1088 (Fla. 5th DCA 2000). Mandate issued on September 29, 2000. (Appendix XIII).

On August 22, 2001, Petitioner filed his first Florida Rule of Criminal Procedure 3.850 motion for post-conviction relief, which he voluntarily dismissed on October 11, 2001. Petitioner filed an amended Rule 3.850 motion on October 22, 2001.   The trial court summarily denied Petitioner's amended motion on August 15, 2003. Petitioner appealed, and the appellate court affirmed on November 4, 2003. *Williams v. State*, 860 So. 2d 435 (Fla. 5th  DCA 2003).   Thereafter, Petitioner filed the instant timely petition for writ of habeas corpus relief. (Doc. No. 1).

## THE GOVERNING LEGAL PRINCIPLES

Because Petitioner filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003). The AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (recognizing that the federal habeas court's evaluation of state-court rulings is highly deferential and that state-court decisions must be given the benefit of the doubt).

## 1.    Standard of Review Under the AEDPA

Pursuant to the AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrase "clearly established Federal law," encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Secretary for Dep't. of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005), *cert. denied*, 127 S. Ct. 348 (2006). The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

Even if the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable." *Id.*

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding." A determination of a factual issue made by a state court, however, shall be presumed correct, and the habeas petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

**2.      Standard for Ineffective Assistance of Counsel**

The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance: (1) whether counsel's performance was deficient and "fell below an objective standard of reasonableness"; and (2) whether the deficient performance prejudiced the defense.[2] *Id.* at 687-88. A court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689-90. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir. 1989).

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective assistance of counsel:

> has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether

---

[2]In *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), the United States Supreme Court clarified that the prejudice prong of the test does not focus solely on mere outcome determination; rather, to establish prejudice, a criminal defendant must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable.

> some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight. *Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted).  Under those rules and presumptions, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

## ANALYSIS

**1.     Claims of Trial Court Error**

   **a.     Denial of Motion for New Trial (Claim Two)**

Petitioner claims that the trial court erred in not granting his motion for a new trial "as the verdicts were contrary to the manifest weight of the evidence in violation of the U.S.C.A. 14th Amendment." (Doc. No. 13 at 6).

At the close of the Government's case, Petitioner's counsel moved for a judgment of acquittal as to the burglary and first-degree murder counts based on a failure to prove burglary or premeditation. (Appendix I at 580-87).  Petitioner's counsel noted that there was no physical evidence that the front door had been kicked in, and the location of the bullet casing under the victim's body, combined with testimony that the gun was 18 to 20 inches from the victim when it was fired, supported Petitioner's claim that the shooting

was accidental. *Id.*[3] The trial court denied Petitioner's motion for judgment of acquittal, holding:

> It is my opinion that the testimony is sufficient to allow the case to go to the jury on either of the two theories that the state is pursuing.
>
> The first-degree felony murder, there is ample testimony that at the time of this incident, [Petitioner] had been forced out of the house and that he was not invited back to the house. He was not given permission to be back in the house and a number of witnesses, including Crystal Pugh and Erika Johnson and Terrelis, indicated that at some point the door was forcibly opened, whereupon [Petitioner] came into the house with a black handgun and said some words to the victim and then a shot or two was fired, a number of shots. I believe that based on that testimony, the entry of the residence was not by any permission and therefore it could constitute a burglary under Florida laws.
>
> And also, to support the theory of premeditation, the witnesses who were all present at the time of the shooting, indicated that [Petitioner] had a confrontation with Joe and left saying words to this effect: No one will sleep in this residence tonight. And, whereupon he left and all of the witnesses said within a span of 15 to 20 minutes he returned with a handgun and the shooting occurred.
>
> So I do find the evidence is sufficient to allow the case to go to the jury.

*Id.* at 588-90. After the jury found Petitioner guilty, his counsel moved for a new trial, and the trial court denied the motion during the sentencing hearing. (Appendix VI at 6-7).

After his appellate counsel filed a brief noting no reversible error pursuant to *Anders v. California*, 386 U.S. 738 (1967), Petitioner argued in his own pro se brief on direct appeal

---

[3]The State opposed Petitioner's motion, arguing that evidence there had been a prior conflict between Petitioner and the Victim, after which Petitioner returned to the House with a gun, supported the State's theory of premeditation. The State further argued that burglary does not require that Petitioner break into the house – only that he entered without permission as the State's witnesses had testified. (Appendix I at 587-88).

that the trial court erred in denying his motion for a new trial "as the verdicts were contrary to the manifest weight of the evidence." (Appendix X). The state appellate court affirmed his convictions *per curiam*. (Appendix XIII).

In assessing Petitioner's claim, this Court's inquiry "is very limited: whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the petitioner guilty beyond a reasonable doubt." *Johnson v. Alabama*, 256 F.3d 1156, 1172 (11th Cir. 2001) (quoting *Jackson v. Virginia*, 443 U.S. 307, 313 (1979)). "[T]he State is not required to rule out every hypothesis except that of the guilt of the defendant, . . . federal courts must defer to the judgment of the jury in assigning credibility to the witnesses and in weighing the evidence." *Id.* (instructing that when "the record reflects facts that support conflicting inferences, there is a presumption that the jury resolved those conflicts in favor of the prosecution and against the defendant").

Here, Petitioner bases his insufficiency of the evidence argument on the testimony of the Chief Medical Examiner for Orange and Osceola County, Florida, Dr. Anderson, that the gun was "about 18 to 20 inches" from the Victim's chest when it was fired.[4] (Doc. No. 13 at 6-7). According to Petitioner, the testimony of Ms. Pugh, Mr. Jacobs and Ms. Justice could not be believed because the distance the bullet had to travel in their version of events

---

[4]Dr. Anderson's estimation was based upon gun powder burn marks on the victim's skin. (Appendix I at 363-64). Dr. Anderson further opined that the gun was "back at least six inches" and the bullet entered the left chest, and struck both kidneys and the aorta as the bullet traveled through the Victim's body in a left to right and downward direction. *Id.* at 354-55 & 367.

is contrary to Dr. Anderson's testimony that the gun was 18 to 20 inches from the victim's body when it was fired. *Id.*

A review of the record reveals that the eye-witness testimony is not inconsistent with the testimony of Dr. Anderson. The room in which the shooting occurred was very small – approximately 11 feet (136 inches north to south) by 14 feet (157 inches east to west). (Appendix I at 436 & 438-39). Ms. Pugh testified that Petitioner took a couple of steps into the room before firing, and his arm was extended. *Id.* at 265-69 & 303. Thus, a significant portion of the 136 inches was accounted for by Ms. Pugh's testimony. Furthermore, Dr. Anderson testified that the physical evidence left open a "number of possibilities" as to how the shooting occurred, and the "only thing we can say for sure is when he was shot he was in a position that puts his left side toward the gun." *Id.* at 382-83.

In light of the record evidence, the Court cannot find that the state courts erred in finding that the evidence at trial was sufficient to sustain Petitioner's convictions. Indeed, the evidence against Petitioner, including his own testimony, strongly supported Petitioner's burglary conviction and his first-degree murder conviction under both the premeditation and felony murder theories. *See supra* Facts And Procedural History at 2-5. Accordingly, Petitioner's second claim must be denied.

### b.   Juror Contamination (Claim One)

Petitioner claims his constitutional rights were violated when the trial court failed to conduct an examination of the voir dire panel "after it was brought to the trial court's attention that [a] potentially prejudicial comment was made by [a] third party in [the]

11

venire persons [sic] presence." (Doc. No. 13 at 4). After his appellate counsel filed an *Anders* brief, Petitioner unsuccessfully raised this issue in his own pro se brief on direct appeal. (Appendices X & XIII).

Petitioner's claim implicates the Sixth Amendment command that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." U.S. Const. Amend. VI. This Sixth Amendment guarantee of a trial by an impartial jury "requires the jury verdict to be based on the evidence produced at trial." *United States v. Perkins,* 748 F.2d 1519, 1533-34 (11th Cir. 1984) (citing *Turner v. State of Louisiana,* 379 U.S. 466, 472 (1965) and *Irvin v. Dowd,* 366 U.S. 717, 722 (1961)). "Extrinsic evidence, evidence that has not been subject to the procedural safeguards of a fair trial, threatens such constitutional safeguards as the defendant's right of confrontation, of cross-examination, and of counsel." *Id.* To protect this Sixth Amendment right, the United States Supreme Court has long held that "[p]rivate communications, possibly prejudicial, between jurors and third persons . . . are absolutely forbidden and invalidate the verdict at least unless their harmlessness is made to appear." *Mattox v. United States,* 146 U.S. 140, 150 (1892).

The rule forbidding private communications between jurors and third persons has been reiterated by the United States Supreme Court with consistent clarity:

> In a criminal case, any private communication [or] contact . . . directly or indirectly, with the juror during a trial about the matter pending before the jury is, *for obvious reasons, deemed presumptively prejudicial,* if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.

*Remmer v. United States,* 347 U.S. 227, 229 (1954) (emphasis added); *see also United States v. Spurlock,* 811 F.2d 1461, 1463 (11th Cir. 1987) (applying *Remmer* standard of presumptive prejudice). Accordingly, "[o]nce the defendant proves extrinsic contact, the burden shifts to the government to demonstrate that the consideration of the evidence was harmless." *United States v. Martinez,* 14 F.3d 543, 550 (11th Cir. 1994). "The presumption [of prejudice] is not conclusive, but the burden rests heavily upon the government to establish, after notice to the defendant, that such contact with the juror was harmless to the defendant." *Remmer,* 347 U.S. at 229. In assessing whether any presumption of prejudice is rebutted, courts "consider many factors including the heavy burden on the government, the nature of the extrinsic information, the manner in which the information reached the jury, and the strength of the government's case." *Martinez,* 14 F.3d at 550.

The record indicates that a third party made an improper statement to one of the members of Petitioner's venire panel. During a break in the jury selection process, and after the venire panel "exited the courtroom," a prospective juror named Ms. Lindsay approached Petitioner's counsel in the presence of the Court:

**Ms. Lindsay:**   May I speak with you?

**Petitioner's Counsel:**   Sure, come on up. Ms. Lindsay, you just indicated there was something you wanted to tell us?

**Ms. Lindsay:**   When we had the ten-minute break the first time, unknowing to me, I sat down in the lobby and I sat next to some people that were there just because there was a vacant seat, and I felt that I should say this because I heard it, and the lady that was sitting next to me said, is the – did they choose the jury? Not her exact words, but that's what she was asking. I said, there

|  | are fifty of us but we haven't been chosen yet. And she said, "Oh, he killed my boyfriend." . . . . |
|---|---|
| **Petitioner's Counsel:** | How many other jurors were around or would have heard them? |
| **Ms. Lindsay:** | I don't remember. You know, people were talking but . . . . |
| **Petitioner's Counsel:** | Were there others around that may have heard it, other jurors? |
| **Ms. Lindsay:** | That might have heard it? Well, we were both sitting and the other people were standing. So, I don't know if they would have heard it. She didn't say it loudly. |

*   *   *

|  |  |
|---|---|
| **Petitioner's Counsel:** | Okay, knowing what she indicated, do you think you'd have a problem serving based on that? |
| **Ms. Lindsay:** | Certainly. |

(Appendix I at 148-49).

After a few additional questions, the Court instructed Ms. Lindsay to say nothing to the other jurors about the exchange and she left. Immediately thereafter, another prospective juror, Mr. Bryant, approached the Court. (Appendix I at 151-52). Mr. Bryant indicated his concern that he had failed to previously inform the court that his brother was involved in a domestic violence case, and indicated that it would not impact his consideration of Petitioner's case. *Id.* Ultimately, Ms. Lindsay was dismissed for cause, but Mr. Bryant was seated on the jury. *Id.* at 164. Petitioner contends that Mr. Bryant was present in the courtroom during the inquiry of Ms. Lindsay, and the trial court erred by failing to inquire whether Mr. Bryant "could be impartial after hearing the inquiry of Ms.

14

Lindsay" and by failing to examine "the remainder of the venire panel as to whether they had heard the comment and shifted from impartiality because of their exposure to it [sic]." (Doc. No. 13 at 4). Respondents contend that the record does not indicate that "Mr. Bryant was privy to the court's discussions with Ms. Lindsay," and even if he did hear the discussion, it would not establish that he could not serve impartially as a juror. (Doc. No. 34 at 7-8).

While the record is far from clear, the Court will assume Petitioner can prove extrinsic contact in that Mr. Bryant may have heard Ms. Lindsay's recitation of the unidentified woman's statement "he killed my boyfriend."[5] Thus, the issue is whether such contact was harmless to Petitioner. *Remmer*, 347 U.S. at 229. To resolve this issue, this Court considers the nature of the information, the manner in which the information reached the jury, and the strength of the government's case. *Martinez*, 14 F.3d at 550.

Here, the nature of the information and the manner in which the information reached Mr. Bryant is not strongly indicative of prejudice. As the prosecutor noted to the state trial court, there were people involved in other trials present in the hall and the unidentified woman may not have been involved in Petitioner's case at all. (Appendix I at 363-64). Further, the contact, if any, preceded Mr. Bryant's indication that he could be impartial, as well as instructions from the state court regarding a juror's obligation to

---

[5]The record does not support Petitioner's claim that other members of the venire panel heard the unidentified woman's statement. Under questioning by Petitioner's counsel, Ms. Lindsay indicated that the statement was made only to her, and it was not said loudly. (Appendix I at 149).

consider only evidence that is presented at trial. Finally, the state's case against Petitioner was extremely strong, including testimony from multiple eye-witnesses that Petitioner shot the Victim over a drug dispute and Petitioner's own testimony regarding his disposal of the murder weapon and his attempt to flee. Under all of the circumstances, this Court cannot conclude that the state trial court's handling of the juror contact issue, and the appellate court's rejection of this issue on direct appeal, was "contrary to" or an "unreasonable application" of clearly established law.[6] Accordingly, this claim is denied.

## 2.     Ineffective Assistance of Counsel Claims

Petitioner raised all nine of his ineffective assistance of counsel claims in his Rule 3.850 motion, and each claim was considered and rejected by the state court. (*See* Appendix XVIII). Since the state court addressed these claims on the merits, federal habeas review is circumscribed by § 2254(d). In assessing Petitioner's ineffective assistance of counsel claims, the state court specifically cited *Strickland* as the standard for judging the adequacy of counsel's performance. *Id.* at 1-2. Therefore, the state court's decision is not contrary to established federal law. Further, as explained below, this Court finds that Petitioner cannot demonstrate that the state court's decision was an unreasonable application of *Strickland*. Even if this Court may have reached a different decision, it cannot be said that the reasoning set forth by the state court was objectively unreasonable.

---

[6] This Court notes that the state court is not required to cite United States Supreme Court cases or even be aware of the cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

a.    Juror Contamination (Claim Eight)

Petitioner's eighth claim relates to the same venire panel contamination issue raised in claim one regarding alleged trial court error. *See supra* Analysis, Part 1.b.  Petitioner claims that constitutionally effective counsel would have questioned Mr. Bryant whether he heard the statement "He killed my boyfriend" and whether he could be fair and impartial or had a fixed "opinion concerning Petitioner's guilt." (Doc. No. 13 at 18).  The state court considered and rejected this claim as follows:

> During a break in the jury selection process, prospective juror Bryant was present when an unidentified person said to prospective juror Lindsey, "he killed my boyfriend." [Petitioner] acknowledges that the matter was brought to the trial court's attention, but he alleges that counsel did not question Mr. Bryant about whether he could be fair and impartial after hearing this comment. Mr. Bryant was ultimately selected to serve on the jury. [Petitioner] contends that he was prejudiced, because if counsel had questioned him, he would have been able to determine whether he had already formed a fixed opinion of his guilt.

> However, counsel asked Ms. Lindsey whether *any* of the prospective jurors (a group which included Mr. Bryant) had heard the comment, and Ms. Lindsey replied: "I don't know if they would have heard it. She didn't say it loudly." Furthermore, it was not only Mr. Bryant who was present when the comment was made. There were two prospective jury panels in the hall when the comment was made. Finally, [Petitioner's] claim of prejudice is based on pure speculation that Mr. Bryant heard the comment and that he was prejudiced as a result of it. He offers no facts to establish a reasonable probability that this is so. Therefore, he has failed to establish that counsel's performance was either deficient or prejudicial.

(Appendix XVIII at 3).

This Court cannot find the foregoing analysis to be objectively unreasonable. To the contrary, it is consistent with this Court's rejection of the corresponding juror contact issue

raised in claim one. *See infra*, Analysis, Part 1.b. Accordingly, Petitioner is not entitled to relief on this claim.

### b.    Consensual Entry Defense (Claim Five)

Petitioner claims that his trial counsel was ineffective in failing to "properly investigate [the] defense of consensual entry to the armed burglary charge."[7] (Doc. No. 13 at 14). Petitioner raised this claim in his Rule 3.850 motion, and the state court found it to be "refuted by the record." (Appendix XVIII at 9-10). This Court agrees. Petitioner's counsel argued to the jury that the victim had invited Petitioner into the House. (Appendix I at 703). Further, Petitioner's counsel moved for judgment of acquittal and a new trial based in part on the argument that the victim had consented to Petitioner's entry into the House. (Appendix I at 584-87). Accordingly, it was entirely reasonable for the state court to determine that Petitioner failed to "establish that counsel's performance was either deficient or prejudicial." (Appendix XVIII at 10). Petitioner is not entitled to relief on this claim.

---

[7]Vague and conclusory allegations are inadequate as a matter of law to raise a cognizable claim of ineffective assistance of counsel. *See United States v. Cranshaw*, 817 F.Supp. 723, 728 (N.D. Ill. 1983), *aff'd without opinion*, 23 F.3d 410 (7th Cir. 1994). Petitioner "must identify the specific acts or omissions of counsel that form the basis for his claim of ineffective assistance." *See United States v. Moya-Gomez*, 860 F.2d 706, 764 (7th Cir. 1988). Moreover, he must provide evidence, not mere conclusory allegations that counsel overlooked exculpatory information. *Barkauskas v. Lane*, 946 F.2d 1292, 1295 (7th Cir. 1991); *cf. Aldrich v. Wainwright*, 777 f.2d 630, 637 (11th Cir. 1985) (speculation insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation). In the present case, Petitioner does not specify what additional evidence should have been developed to support the "consensual entry" defense, and Petitioner's bald assertions are inadequate to overcome the presumption that counsel acted reasonably. *Matura v. United States*, 875 F.Supp. 235, 237 (S.D.N.Y. 1995).

c.   **Concessions of Guilt (Claim Seven)**

Petitioner claims that his trial counsel was constitutionally ineffective "for failing to uphold Petitioner's defense of not guilty." (Doc. No. 13 at 17). The state court found that counsel's objected-to conduct did not prejudice Petitioner:

> [C]ounsel specifically argued that [Petitioner] was not guilty of either murder or armed burglary, the crimes charged in the indictment. Counsel also argued the gun discharged accidentally or through the action of the victim, as the victim attempted to rob [Petitioner,] consistent with [Petitioner's] own account of the incident.

> *   *   *

> [Petitioner] himself testified that he entered the victim's house with a loaded, concealed gun, which he pulled out during a struggle, and it discharged at least once after the victim grabbed it. He said that after it went off, everyone backed up, whereupon he grabbed the gun and ran. His own testimony provided ample evidence from which the jury could conclude that he was guilty as charged, or guilty of a lesser offense. Thus, there is no reasonable probability that the outcome of the proceedings would have been different in the absence of the statements [Petitioner] challenges in counsel's opening and closing arguments. Therefore, he has failed to establish that counsel's statements resulted in prejudice.

(Appendix XVIII at 4-5 (record citations omitted)).

A review of Petitioner's counsel's opening and closing argument confirm his efforts to put the best possible spin on extremely damaging evidence. Accordingly, the state court's analysis cannot be considered objectively unreasonable. Petitioner is not entitled to relief on this claim.

d.   **The Toxicologist (Claim Ten)**

Petitioner claims his trial counsel was ineffective because he failed to have a toxicologist testify regarding the effect of cocaine on the Victim's mental state just prior to

19

the shooting.[8] (Doc. No. 13 at 22).  The state court held that Petitioner failed to establish

either prejudice or deficient performance with regard to the toxicologist claim:

> [Petitioner] fails to identify any specific actions on the part of the victim
> which were consistent with cocaine use.  The mere claim that the victim was
> aggressive does not, standing alone, provide a sufficient basis to conclude
> that he was acting as a result of the effects of cocaine.  As the State argues,
> [Petitioner's] allegations are more consistent with the conclusion that the
> conduct of the victim and his son was the result of a premeditated robbery
> attempt, rather than a drug-induced outburst.  Therefore, [Petitioner] has
> failed to set forth facts sufficient to establish that counsel's performance was
> either deficient or prejudicial.

(Appendix XVIII at 7-8).  Again, this Court finds the state court's analysis entirely

reasonable and rejects this claim.

   e.   **Evidentiary Issues (Claims Six and Nine)**

        i.   **Unrelated Crime Evidence (Claim Six)**

Petitioner claims that trial counsel was ineffective in failing to object to the

admission of Petitioner's tape-recorded statement that he has "one violent crime, resisting

the police, but they jump on me and I got the charge." (Doc. No. 13 at 16).  The state court

rejected this argument as follows:

> [T]he jury also heard from [Petitioner] himself that he was a five-time
> convicted felon who regularly sold illegal drugs and, although he was not
> legally allowed to do so, he often carried a concealed, loaded handgun.  In
> light of that testimony, there is no reasonable probability that the outcome
> of the trial would have been different if counsel had ensured that
> [Petitioner's] admission to having a conviction for resisting the police was
> excluded from the tape.  Therefore, [Petitioner] has failed to establish that
> [his] counsel's performance resulted in prejudice.

---

[8]Dr. Anderson testified that cocaine was present in the Victim's bloodstream that
had been ingested "within minutes" of his death. (Appendix I at 369-72).

(Appendix XVIII at 2 (record citations omitted)).

This Court agrees that even if counsel was deficient in failing to object to the admission of this information, Petitioner has not established prejudice under *Strickland*. Petitioner testified that he had been convicted of five felonies and he was an active drug dealer who regularly carried a nine millimeter, semi-automatic weapon loaded with fourteen rounds. Under these circumstances, there is simply no "reasonable probability that . . . the result of the proceeding would have been different" had counsel objected and the statement been redacted from the tape-recording. *See Strickland*, 466 U.S. at 694. Accordingly, Petitioner is not entitled to relief on this claim.

### ii. The "Willow Bend Boys" (Claim Nine)

Petitioner claims his trial counsel was ineffective for failing to file a motion *in limine* before trial to preclude any reference to gang-related evidence regarding the "Willow Bend Boys." (Doc. No. 13 at 20). The state court held that this claim was not supported by the record, and this Court agrees. As the state court noted, the prosecutor's opening statement included no accusation that Petitioner was involved in "the Willow Bend Boys or any other gang, and the jury could just as easily have concluded that it was the victim or members of his household who belonged to the gang." (Appendix XVIII at 10; Appendix I at 208-09). During presentation of the evidence, Petitioner's counsel successfully objected to references to both the Willow Bend Boys and the Willow Bend area. (Appendix I at 251-57 & 415-17). Accordingly, it was reasonable for the state court to find Petitioner "failed to establish that

counsel's performance was either deficient or prejudicial."   (Appendix XVIII at 11). Accordingly, Petitioner is not entitled to relief on this claim.

### f.    Prosecutorial Misconduct (Claims Three and Four)

Petitioner sets forth two claims that his trial counsel was "ineffective for failing to object to the number and sheer pervasiveness of the prosecutor's misconduct during trial . . . ." (Doc. No. 13, at 9).  In support of claim three, Petitioner specifies three different instances of purported prosecutorial misconduct:  (1) eliciting inflammatory testimony from state witness Ms. Pugh regarding her ten-year-old son; (2) improperly refreshing the recollection of state witness Ms. Johnson; and (3) eliciting testimony from Petitioner during cross-examination that he was not permitted to carry a gun as a "multi-convicted felon." *Id.* at 9-10.  In claim four, Petitioner argues that his trial counsel failed to object to various acts of prosecutorial misconduct during opening and closing arguments: (1) bolstering of law enforcement; (2) commenting on facts not in evidence; (3) corroborating witness testimony of Ms. Johnson; (4) commenting that Petitioner was not allowed to carry a firearm; (5) referencing Petitioner's out-of-court statement; and (6) misstating the law. *Id.* at 11-14.

The state court considered and rejected each of Petitioner's claims regarding his counsel's handling of alleged prosecutorial misconduct:

> There was simply no prejudice in counsel's failure to object to the question about Ms. Pugh's son.  Furthermore, counsel did object to counsel's redirect of Ms. Johnson, and the trial court sustained the objection.  Counsel also objected to the question about the gun. [Petitioner] himself already admitted that he had five prior felonies, and he also admitted that he had gone into the house with a gun. Thus, the record demonstrates that counsel objected when

22

appropriate. This court declines to find that any of the particular comments [Petitioner] identifies would have justified mistrial. Therefore, [Petitioner] has failed to establish that counsel's failure to move for mistrial was either deficient or prejudicial.

(Appendix XVIII at 8-9 (record citations omitted)).

The record reveals that the prosecutor did not misstate the law, reference inadmissible evidence, or improperly bolster the witnesses, and Petitioner's counsel objected when appropriate. Indeed, the trial court sustained counsel's objection to the prosecutor's efforts to refresh Ms. Johnson's recollection. Further, it is pure speculation that the jury would have concluded that Ms. Pugh's son was "Baker-acted" because he witnessed the Victim's murder. Petitioner's claim that the prosecutor attempted to insinuate that Petitioner's mother did not believe he was innocent by referencing Petitioner's statement "tell my mother I didn't do it" while "looking out into the benches behind the Petitioner's table, knowing that [his] mother was not present" is similarly based on speculation. Accordingly, the state court's analysis regarding Petitioner's prosecutorial misconduct claims was clearly reasonable, and Petitioner is not entitled to relief on these claims.

### g. Cumulative Error (Claim Eleven)

Petitioner's final claim is that the "accumulation of [trial] counsel errors rose to a fundamental unfairness" that violated Petitioner's constitutional rights. (Doc. No. 13 at 23). The state court rejected this claim as "legally insufficient" and not supported by the record: "this court has found that counsel's performance was neither deficient nor prejudicial, and it follows that the cumulative effect of counsel's performance did not prejudice the

outcome of [Petitioner's] trial."  (Appendix XVIII at 10-11).  As set forth above, this Court agrees that none of Petitioner's individual complaints regarding his trial counsel's conduct satisfy the *Strickland* standard for ineffective assistance.  Accordingly, Petitioner's claim of prejudice due to "cumulative error" fails.

## CONCLUSION

Any of Petitioner's allegations not specifically addressed herein have been found to be without merit.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.      The Amended Petition for Writ of Habeas Corpus filed by Quincy Williams (Doc. No. 13) is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**.  The Clerk of the Court shall enter judgment accordingly.

2.      The Clerk of the Court is directed to close this case.

**DONE AND ORDERED** at Orlando, Florida, this ___ day of February, 2007.

G. KENDALL SHARP
SENIOR UNITED STATES DISTRICT JUDGE

Copies to:
pslc 1/31
Counsel of Record
Quincy Williams

24